**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

EDWARD D. HEATON,

       Plaintiff,

vs.

THE WEITZ COMPANY, INC.,

       Defendant.

No. 05-CV-102-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.  **LEGAL STANDARD FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . **2**

IV.  **FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
     *A.*    *Weitz* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
     *B.*    *Heaton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     *C.*    *Noel Huber's Derogatory Comments* . . . . . . . . . . . . . . . . . . . . **6**
     *D.*    *The Complaint, Investigation and Retirement* . . . . . . . . . . . . . . **6**
     *E.*    *Argument between Heaton and Brian Henecke* . . . . . . . . . . . . **7**
     *F.*    *August of 2003* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
     *G.*    *The fall of 2003 and early 2004* . . . . . . . . . . . . . . . . . . . . . . **9**
     *H.*    *Heaton's Complaints* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

V.   **SUMMARY OF THE ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

VI.  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
     *A.*    **McDonnell Douglas** *Burden-Shifting Framework* . . . . . . . . . . . . **12**
     *B.*    *The Prima Facie Case* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
         *1.*    *Protected conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
         *2.*    *Adverse employment action* . . . . . . . . . . . . . . . . . . . . **14**
         *3.*    *Causal nexus between protected conduct and adverse employment action* . . . . . . . . . . . . . . . . . . . . . . . . . **17**
     *C.*    *The Legitimate, Nondiscriminatory Reason* . . . . . . . . . . . . . . . **21**

    *D.      Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

**VII.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

## *I.  INTRODUCTION*

Plaintiff Edward D. Heaton ("Heaton") sued his former employer, Defendant The Weitz Company, Inc. ("Weitz"), alleging national origin discrimination and retaliation. The instant matter before the court is Weitz's Motion for Summary Judgment ("Motion") (docket no. 44).

## *II.  PROCEDURAL BACKGROUND*

On June 21, 2005, Heaton filed a Complaint. In Count I, Heaton alleges national origin discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981a. In Count II, Heaton alleges national origin discrimination in violation of Chapter 216 of the Iowa Civil Rights Act ("ICRA"). In Counts III and IV, Heaton alleges retaliation in violation of Title VII and 42 U.S.C. § 1981a, and the ICRA, respectively. In Count V, Heaton alleges blacklisting, in violation of Iowa Code § 730.2. On July 13, 2005, Weitz filed an Answer.

On June 30, 2006, Weitz filed the instant Motion. On July 24, 2006, Heaton filed a resistance. On August 1, 2006, Weitz filed a reply. Neither party requested oral argument. Finding the Motion to be fully submitted and ready for decision, the court turns to consider it.

## *III.  LEGAL STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986)).  A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Id*.  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.,* 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss,* 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Baum v. Helget Gas Prods., Inc.,* 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial.").  The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.  "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.,* 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.,* 318 F.3d 803, 809 (8th Cir. 2003)).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)).  Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson*, 931 F.2d at 1244.  To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary

judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341.

Nevertheless, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citation and internal citation omitted); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must be used to determine whether summary judgment is appropriate).

## IV. FACTUAL BACKGROUND

Viewing the facts in the light most favorable to Heaton, as the law requires, the court finds the following facts for purposes of this Motion only:

### A. Weitz

Michael Novy is the Vice President of Weitz Industrial, the business unit of Weitz that employed Heaton. Novy reports to Weitz's president, Jim Simmons. Novy supervises project managers and superintendents. Project managers are the salaried personnel who oversee the day-to-day operations of Weitz's projects. Project engineers report to the project managers. Job superintendents are the field personnel assigned to run a particular project. Superintendents and assistant superintendents may hold credentials from one or more trade unions. Superintendents and assistant superintendents are generally given more pay than foremen and journeymen, a company truck and a cell phone.

There is a hierarchy among ironworkers at Weitz and in the construction industry generally. The lowest level ironworker is a journeyman. If a journeyman is promoted, he becomes an ironworker foreman, and, if he receives another promotion, he becomes an ironworker general foreman.

During times when the work is less abundant, Weitz lays off journeymen, but it tries to keep the foremen and superintendents employed. Due to the collective bargaining agreement Weitz has with the Ironworkers Local 89 Union ("Union"), it is required to lay off journeymen first and superintendents last. When there is a lack of work, the layoffs occur by job title, beginning with journeymen, then foremen, then general foremen, then assistant superintendents, then superintendents and, finally, union stewards. Weitz does not commonly demote superintendents when there is a shortage of work because they do not want to lose these valuable and highly trained employees to another construction company.

Weitz maintains a "preferred hire list" of employees that it will and will not accept back to work. The Union employs business agent Charley Zahorik. When companies have ironworker positions available, they generally call Zahorik and inform him that there are jobs available. When a foreman or superintendent calls Zahorik at the Union's hall, Zahorik provides names of ironworkers who are available for work. Due to Weitz's preferred hire list, the foreman or superintendent must check with Weitz office employees Sue Johnson or Valerie Chamberlain before they ask Zahorik to call the ironworker to work for Weitz.

### B. Heaton

Heaton's birth mother is Italian and his birth father is Spanish. Heaton is an ironworker and a member of the Union. In October of 2000, the Union sent Heaton to

work at Weitz as a journeyman. In April of 2001, he was promoted to foreman, and, in December of 2002, he was promoted to general foreman. In January of 2003, Heaton was promoted to the position of an ironworker superintendent.[1]

### C. Noel Huber's Derogatory Comments

In March of 2003, Heaton's co-workers told Heaton that Noel Huber, a Weitz superintendent, called him a "fucking spic" on more than one occasion. One time, Ben Wright, a Teamster truck driver who worked with both Heaton and Huber, followed through on Huber's instruction to "go and tell Heaton that Heaton was a 'fucking spic.'" Huber used racial or ethnic slurs when talking about Heaton on four or five occasions, and Huber used the term "WOP" (a derogatory term for a person of Italian descent) when referring to Dennis Wolrab, another Weitz employee. On one occasion, Huber commented that he would rather have his daughter marry a "nigger" than a "spic." Heaton did not confront Huber about any of the derogatory comments.

### D. The Complaint, Investigation and Retirement

On April 28, 2003, Heaton complained about Huber's "spic" comments to Chantry DeVries, Weitz's human resources manager who works in the Des Moines, Iowa, office. Heaton told DeVries that he wanted the name-calling to stop and that he wanted Weitz to terminate Huber's employment. Weitz rarely received complaints like Heaton's complaint.

After receiving Heaton's complaint, DeVries contacted Novy. DeVries asked Novy to investigate the situation. Novy spoke individually with Heaton, Huber, Ben Wright and Jeff Wright.[2] When Novy confronted Huber about the racial name-calling, Huber did not

---

[1] Heaton claims that he was promoted to an ironworker superintendent position. Novy claims that the highest position Heaton ever held at Weitz was assistant ironworker superintendent. Viewing the evidence in the light most favorable to Heaton, as the court is required to do for this Motion, the court finds that he was an ironworker superintendent.

[2] Jeff Wright is a Senior Teamster warehouse truck driver at Weitz.

admit that he used inappropriate terms when referring to Heaton. Based upon the conversation with Huber and the investigation, however, Novy concluded that some inappropriate conduct occurred. Novy concluded that Huber made the racial comments and such conduct warranted some form of discipline.

Novy did not want to continue to employ Huber at Weitz's job sites. However, Huber was also a member of the Teamster's union, and Weitz did not have the ability to terminate Huber's employment due to the collective bargaining agreement. Therefore, Novy was given the task of persuading Huber to retire. Novy met with Huber and gave him the choice of retiring or accepting a demotion from superintendent to truck driver. Huber chose to retire.

Huber's last day on the job with Weitz was May 2, 2003. On May 5, 2003, Novy met with Heaton and told him that Huber was no longer employed by Weitz. Novy also told Heaton that he was sorry that he had to let Huber go. Huber had been a long-term, valued employee who turned a profit for Weitz.

At the time Huber retired, he was working as a superintendent with project manager Brian Henecke on a project at the General Mills popcorn plant in Iowa City, Iowa ("General Mills Job"). Novy informed Henecke and other project managers with whom Huber had been working that Huber had retired. Novy had to find another superintendent to replace Huber at the General Mills Job.

Huber's retirement and Heaton's role in it were "big news" amongst the office personnel and the construction crews, including the ironworkers, at Weitz.

### E. Argument between Heaton and Brian Henecke

In May of 2003, Heaton and project manager Henecke were both working at the Quaker Oats plant in Cedar Rapids, Iowa ("Quaker Oats Job"). On May 28, 2003, Heaton and Henecke engaged in an argument based, in part, on a union-related issue involving whether the ironworkers or the millwrights had the jurisdiction to unload trucks.

Jurisdictional disputes between different unions are common in the construction trade and at Weitz. Heaton, who may not have been assigned to work on the job site that day, argued adamantly that the job was to be done by the ironworkers. Kameron Peterschmidt, a Weitz foreman assigned to work for Heaton, was present during the argument. At the conclusion of the argument, Henecke called Heaton a "spic" and called Peterschmidt a "goon."

Henecke perceived Heaton's conduct to be insubordination and asked Novy to fire Heaton for his behavior. Henecke commenced his employment with Weitz in August of 2001, and, during his career with Weitz, he had never before sought to have another Weitz employee fired. It is uncommon for workers to be terminated over jurisdictional issues.

On the same day as the argument, May 28, 2003, Novy called Heaton into his office, because he intended to terminate Heaton's employment at Henecke's request. At the meeting, Novy handed Heaton his last paycheck and told Heaton that he was going to have to terminate his employment. Heaton asked why he was going to be terminated over a jurisdictional dispute. Heaton also questioned why he was being terminated so soon after he had complained about Huber's derogatory comments. At that point, Novy retrieved the paycheck from Heaton. Novy decided that termination was too harsh of a punishment and decided to give Heaton a second chance. Novy told Heaton that Heaton would not work on any of Henecke's projects until Heaton apologized to Henecke. During the meeting, Heaton did not mention to Novy that Henecke called him a "spic" while they were arguing at the Quaker Oats Job. Heaton was still an employee of Weitz when he left the meeting.[3]

## F.  August of 2003

Heaton did not work on any jobs involving Henecke until he apologized to Henecke. In early August of 2003, just before Heaton began working on a stair job at the Quaker Oats plant ("Quaker Oats Stair Job"), Heaton and Henecke spoke and Heaton apologized

---

[3]  Between December 2002 and November 2003, Heaton worked full-time, that is, between 137 and 217 hours each month, for Weitz.

for the May 28, 2003 incident. Heaton worked at the Quaker Oats Stair Job under the supervision of Henecke for the remainder of his employment at Weitz.

In August of 2003, Peterschmidt was working as the ironworker foreman under the supervision of Heaton, who was the ironworker superintendent at the Quaker Oats Stair Job. Tom Waldrep was working as a journeyman under Heaton's supervision. Novy and a few other Weitz managers went to the site of the Quaker Oats Stair Job and terminated the employment of Peterschmidt and Waldrep. Peterschmidt and Waldrep were told that they were being terminated due to security problems and because of their criminal backgrounds. Peterschmidt had "some assault charges" in his criminal background. Superintendent Dennis Wolrab helped Heaton locate replacement workers. The loss of Waldrep and Peterschmidt caused Heaton and his crew to fall behind on the Quaker Oats Stair Job. Heaton had difficulty completing the job on time because Peterschmidt was Heaton's "right-hand man who had been trained specifically for the work [that they] were performing."

### G. The fall of 2003 and early 2004

In October of 2003, the Quaker Oats Stair Job that Heaton had been working on was completed. Heaton had been assigned to work with project manager Dan Hackbarth after the Quaker Oats Stair Job was complete.

On October 29, 2003, following a meeting with Weitz superintendents, Novy had a private conversation with Heaton. Novy told Heaton that he was going to be demoted to journeyman because there was no superintendent work available. According to Heaton, Novy told Heaton: "Things are catching up with you." Novy offered Heaton a journeyman position on a project at the ADM site ("ADM Job"). Heaton declined the work because he did not want to be demoted. Heaton, instead, decided to take a few weeks off of work and wait to see if the work increased.

Zahorik, Novy, Peterschmidt, Sue Johnson and Jeff Wright cannot identify an ironworker superintendent who was ever demoted all the way down to journeyman. Novy cannot identify a superintendent *in any trade* at Weitz who had been demoted to an entry-level position.

On November 4, 2003, Novy told Heaton that there would not be any work available for him with Weitz until the fall of 2004. Around this same time period, Novy re-assigned the Hackbarth job to ironworker superintendent Chris Bovero.

On December 3, 2003, Weitz employee Larry Johnson told Heaton that Weitz ironworkers were working at Longview Fibre ("Longview Fibre Job") in Mason City. The Longview Fibre Job involved work in a mine and Heaton had received special mine safety training through his employment at Weitz.

On December 4, 2003, Novy called Heaton and asked him to return the company truck and cell phone. On December 5, 2003, Heaton returned them.

On January 9, 2004, Heaton emailed DeVries and claimed that he was not working because Weitz employees were retaliating against him.

On January 15, 2004, Heaton went to the Weitz warehouse and saw other Weitz ironworkers working.

On January 16, 2004, DeVries emailed Heaton the following: "I have been informed that you have been contacted 3 or 4 times about coming back to work at Cargill and you have turned down the offer every time. Why have you not come back to work? Thank you." The same day, Heaton responded and indicated that he had never received a call from Weitz "informing [him] of this work." It is common practice for an employer like Weitz to contact the Union business agent when there is work for an ironworker. No one from Weitz ever contacted Zahorik, Heaton's Union business agent, during this time. DeVries did not follow up and find out why no Weitz employee ever contacted Zahorik. DeVries also did not further investigate Heaton's claims of retaliation.

## H. Heaton's Complaints

On January 21, 2004, Heaton filed a complaint charging discrimination and retaliation with the Cedar Rapids Civil Rights Commission ("CRCRC"). In 2004, Heaton never received a call asking him to return to his superintendent position and he was not offered work as a foreman.

On January 21, 2005, Weitz terminated ironworker superintendent Bovero, but Weitz did not call Heaton back to work. On March 8, 2005, Heaton filed a second complaint with the CRCRC because Weitz did not call Heaton or Zahorik when Bovero was fired.

Since December of 2003, Weitz has publicized in a local newspaper its need for skilled trade workers, like ironworkers, for its booming construction and maintenance business. Weitz has had "hundreds" of jobs that require ironworkers since that time. Novy admitted that, since December of 2003, Weitz has had work for Heaton.

## V. SUMMARY OF THE ISSUES

In his papers, Heaton states that he does not resist summary judgment with respect to his national origin discrimination/hostile work environment claims[4] or his blacklisting claim. (docket no. 20-1 at pp. 8-9). Therefore, the court shall grant summary judgment with respect to Counts I, II and V.

Heaton resists summary judgment on Counts III and IV, his retaliation claims. Weitz claims that there is no evidence supporting "even a prima facie case of retaliation, as [Heaton] suffered no adverse employment action," and it argues that there is no causal connection between the protected activity and Heaton's layoff. Heaton argues that he

---

[4] In the Complaint, Heaton titles Counts I and II "National Origin Discrimination" claims and appears to claim disparate treatment based upon his national origin. Both parties, however, refer to these claims as "hostile work environment claims." (*See* docket no. 14-1 at ¶ 2 ("[Heaton] alleges a claim against Weitz for hostile work environment . . . ."); docket no. 20-1 at p. 8 (explaining that Heaton "does not resist summary judgment with respect to his hostile working environment claims . . . .")).

engaged in three protected activities: (1) he reported Huber's comments to DeVries; (2) he filed a complaint with the CRCRC; and (3) he filed a second complaint with the CRCRC. Heaton argues that he suffered an adverse employment action when Novy told him that he could either work as a journeyman at the ADM Job or be laid off. Heaton argues that there is a connection between the adverse employment action and his protected activities, and he argues that there are disputed issues of material fact regarding Weitz's true motivation for forcing him to agree to a demotion or be laid off.

## VI. ANALYSIS

### A. McDonnell Douglas *Burden-Shifting Framework*

Heaton's retaliation claims, whether brought under Title VII or the ICRA, are analyzed under the same framework. Iowa courts have traditionally turned to federal law for guidance in analyzing claims under the ICRA. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983); *see Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (explaining that the ICRA was modeled after Title VII and that federal precedent is applicable to discrimination claims under the ICRA). Although the Iowa Supreme Court has recently indicated that it will entertain arguments that the ICRA can be interpreted differently than Title VII, neither party asks the court to deviate here. *See McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to interpret ICRA differently than Title VII where neither party so argued, but indicating that, although Iowa courts have traditionally looked to federal law for guidance in interpreting the ICRA, they are not bound to federal law and may deviate from it if the parties argue for a deviation from the federal analysis).

Heaton concedes that he does not have direct evidence of retaliation. Therefore, the court will employ the burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005) (applying the burden-shifting framework in retaliation case); *see also Hite*

*v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) ("An employee can prove retaliation through circumstantial evidence using the *McDonnell Douglas* burden-shifting analysis." (citations omitted)). "The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006).

> To succeed under this analytical framework, the plaintiff must first present evidence sufficient to establish a prima facie case. *Hesse v. Avis Rent A Car Sys., Inc.,* 394 F.3d 624, 632 (8th Cir. 2005). There are three elements to a prima facie retaliation case. The plaintiff must demonstrate that he or she took part in protected conduct, that he or she was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action. *Id.* The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and "[a] minimal evidentiary showing will satisfy this burden of production." *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 850 (8th Cir. 2005) (quoting *Pope v. ESA Serv., Inc.,* 406 F.3d 1001, 1007 (8th Cir. 2005)).

*Id.* "Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the plaintiff to show that the defendant's reason was pretextual." *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005) (citing *Hesse*, 394 F.3d at 631). "The ultimate burden of proof or persuasion to show that the employer's conduct was motivated by retaliatory intent remains at all times on the plaintiff." *Wallace*, 442 F.3d at 1119 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

### B. The Prima Facie Case

#### 1. Protected conduct

The court finds, as a matter of law, that Heaton established the first element of a prima facie case. On April 28, 2003, when Heaton reported Huber's racist comment to DeVries, he engaged in protected conduct. *See Cheshewalla v. Rand & Son Const. Co.,*

415 F.3d 847, 849 & 851 (8th Cir. 2005) (determining that plaintiff in sexual harassment retaliation case established that she had "engaged in statutorily protected conduct" because she had reported to defendant's equal employment opportunity officer that one of defendant's employees was exposing himself to women); *see also Kasper*, 425 F.3d at 503 & n.3 (rejecting plaintiff's contention that there was a material issue of fact in dispute and concluding that plaintiff first engaged in protected activity when she reported her manager's inappropriate conduct to the defendant's management-level employees).

### 2.    *Adverse employment action*

The court finds, as a matter of law, that Heaton presented evidence from which a jury could find that he suffered an adverse employment action. The court finds that Heaton established the second element of a prima facie case.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court recently announced a new standard for the adverse employment action requirement in the context of a Title VII retaliation claim. The newly announced standard differs from the one previously used by the Eighth Circuit Court of Appeals. *See id.* at 2410 (citing *Manning v. Metro. Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997)). The Supreme Court ruled that "the anti-retaliation provision [of Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13 (citation omitted). It determined that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quotations omitted). The Supreme Court explained that it "speak[s] of *material* adversity because [it] believe[s] it is important

to separate significant from trivial harms." *Id.* (emphasis in original). The Supreme Court further explained that it "refer[s] to reactions of a *reasonable* employee because [it] believe[s] that the provision's standard for judging harm must be objective." *Id.* at 2415 (emphasis in original).

The court finds that, under the standard announced in *White*, Heaton has raised a genuine issue of material fact with respect to whether he suffered a "materially adverse" action. The meeting Novy had with Heaton on May 28, 2003, after the jurisdictional argument between Heaton and Henecke at the Quaker Oats Job, was, as a matter of law, a materially adverse action. *Id.* at 2415. *But see Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000) (en banc) (holding that an unfavorable performance evaluation that does not lead to a change in compensation, responsibilities or benefits does not constitute an adverse employment action under Title VII). Under the new standard, Novy's acts of printing out Heaton's last check and talking with Heaton about firing him "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *White*, 126 S. Ct. at 2415, even though it did not ultimately "detrimentally alter the terms or conditions" of Heaton's employment, *Spears*, 210 F.3d at 854.

Even if the challenged action on May 28, 2003, is not enough to meet the new standard articulated in *White*, Heaton has certainly raised a material issue of fact regarding whether he suffered an adverse employment action in the fall of 2003. Heaton was promoted to a superintendent position in January of 2003. Heaton worked at the Quaker Oats Stair Job until it was completed in October of 2003. On October 29, 2003, Novy offered Heaton a journeyman position at the ADM Job. On November 4, 2003, Novy reassigned Heaton's superintendent position at the Hackbarth project to superintendent

Bovero. It is undisputed that Heaton refused the work at the ADM Job because he wanted to wait a few weeks to see if a superintendent job came open. The evidence shows that Heaton never again worked for Weitz in any capacity.

There is a genuine issue of material fact as to whether Heaton was permanently laid off or whether Heaton quit. Heaton's rejection of the journeyman work at the ADM Job is not necessarily enough to grant summary judgment in Weitz's favor. *See MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004) (holding in a gender discrimination case that, "where an employer offers to substitute a new job for one that has been eliminated, the employee's rejection of the new job does not necessarily indicate that the employee has resigned"). Prior to *White*, if the journeyman position was "sufficiently inferior" to the one that Heaton originally held, then Weitz's offer may constitute an "adverse action." *MacGregor*, 373 F.3d at 928. *Cf. Reynolds v. Ethicon Endo-Surgery, Inc.*, 454 F.3d 868, 872 (8th Cir. 2006) (determining that the plaintiff did not suffer an adverse employment action where she rejected a transfer offer that was a "lateral transfer with the same job title, salary and advancement prospects"). Under the more relaxed standard announced in *White*, it is even more clear that Heaton has raised a material issue of fact regarding whether he suffered a adverse employment action. The evidence shows that it took Heaton three years to rise through the ironworker ranks from journeyman to superintendent at Weitz. There is also evidence in the record establishing that a journeyman's salary, benefits and responsibilities are significantly different from those of an assistant superintendent or superintendent. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (holding, as a matter of law, that the employer's "conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action"). Therefore, Heaton has established, for summary judgment purposes, that Weitz took a materially adverse employment action against him between October 29, 2003, and November 4, 2003—Weitz

16

took the Hackbarth project assignment away from Heaton, gave it to Bovero and offered Heaton a demotion. *See MacGregor*, 373 F.3d at 928 (explaining that, because there was a "conflict over whether [the plaintiff] quit or was fired after having received an alternative offer of employment," the jury could find liability and, therefore, the question of whether there was "an adverse action [was] an issue of fact for a jury to determine").

### 3. Causal nexus between protected conduct and adverse employment action

The court finds, as a matter of law, that Heaton established the third element of a prima facie case. Heaton presented sufficient evidence to raise a genuine issue of material fact as to whether his complaints about Huber's derogatory comments caused the adverse employment action. In other words, Heaton established a "causal nexus between the protected conduct and the adverse action." *Wallace*, 442 F.3d at 1119. "To establish a causal link . . . , the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite*, 446 F.3d at 865 (quotations omitted). "[E]vidence that gives rise to 'an inference of retaliatory motive' on the part of the employer is sufficient to establish a causal link." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (quoting *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992)).

"It is well-established in [the Eighth Circuit] that mere temporal proximity between an employee's protected activity and the employer's adverse employment treatment generally will not suffice to create a genuine issue of fact on a retaliation claim." *Tatum v. City of Berkeley*, 408 F.3d 543, 555 (8th Cir. 2005); *see Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing cases which hold that three-month and four-month intervals between the protected activity and the adverse employment action is insufficient to establish the causal nexus); *Kipp*, 280 F.3d at 897 (determining that a two-month interval was, by itself, insufficient to establish a causal nexus). The Eighth Circuit Court of Appeals has stated:

An employee can establish a causal link between her protected activity and the adverse employment action through "the timing of the two events." *Eliserio v. United Steelworkers of Am.,* 398 F.3d 1071, 1079 (8th Cir. 2005). "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." *Smith* [*v. Allen Health Sys., Inc.,*]*,* 302 F.3d [827,] 832 [(8th Cir. 2002)]. The mere coincidence of timing, however, is rarely sufficient to establish the causation element. *Haas v. Kelly Serv., Inc.,* 409 F.3d 1030, 1037 (8th Cir. 2005). Cases in which we have determined that temporal proximity alone was sufficient to create an inference of the causal link "have uniformly held that the temporal proximity must be 'very close.'" *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 859 (8th Cir. 2005).

Even if temporal proximity alone is insufficient to establish causation, the employee may attempt to prove causation by providing evidence of the employer's discriminatory comments. *See Watson v. O'Neill,* 365 F.3d 609, 613 (8th Cir. 2004) (finding a causal connection between the employee's protected activity and the adverse employment action where one supervisor said that he was not "going to let a nigger manage my bitches," while another supervisor commented that the employee "would never excel in the agency" because he assisted in a 1993 employment discrimination case against the supervisor). Furthermore, where an ultimate decisionmaker relies on the discriminatory comments of another employee or supervisor in deciding to terminate the employee, the employee may be able to establish a causal connection. *See Fast v. S. Union Co., Inc.,* 149 F.3d 885, 891 (8th Cir. 1998).

*Hite*, 446 F.3d at 866. However, "[a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *Hesse*, 394 F.3d at 633. "[A] longer time gap between the protected activity and the adverse employment action 'weakens the inference of retaliation that arises when a retaliatory act occurs shortly after the complaint.'" *Shanklin v. Fitzgerald*, 397 F.3d 596, 604 (8th Cir. 2005) (quoting

*Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir. 1999)). With a "lengthy delay, any causal nexus inference tends to evaporate." *Id.* The Eighth Circuit Court of Appeals has determined that gaps of ten months and one year equate to such "lengthy delays." *See Kasper*, 425 F.3d at 502-04 (one year gap); *Shanklin*, 397 F.3d at 604 (ten month gap).

Here, there was a six-month gap between April 28, 2003, that is, the date Heaton complained about Huber's comments, and October 29, 2003, that is, the date he was offered work as a journeyman. This six-month time interval cannot justify a causal link as a matter of law. *See McBurney v. Stew Hanson's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005) ("We have held that a two-month interval between protected activity and termination diluted any inference of causation such that the temporal connection could not justify a causal link as a matter of law." (citing *Smith*, 302 F.3d at 833)); *cf. Wallace*, 442 F.3d at 1119 (stating that "the timing in this instance strongly supports an inference of causation for the purpose of the prima facie case" where only fifteen days passed between the time plaintiff reported harassment and the time her employer made the decision to terminate her). Heaton has not shown a causal connection based on temporal proximity, alone, because "any causal nexus inference evaporated." *See Shanklin*, 397 F.3d at 604.

The question, then, is whether Heaton has shown a causal nexus based upon discriminatory comments or actions. *Hite*, 446 F.3d at 866 (citing *Watson*, 365 F.3d at 613); *see McBurney*, 398 F.3d at 1003 (holding that "[n]either time nor discriminatory actions link[ed]" the plaintiff's transfer to his taking leave under the Family Medical Leave Act and affirming grant of summary judgment because the plaintiff failed to establish "a sufficient causal link" in making his prima facie case of retaliation); *Watson*, 365 F.3d at 613 (finding a causal connection, in part, because of a supervisor's derogatory racial comments).

The court finds the following facts create the requisite causal nexus:

Heaton complained to DeVries about Huber's comments on April 28, 2003. Novy punished Huber by giving him the choice of retirement or being demoted all of the way down to truck driver. Huber's forced retirement was "big news" at Weitz.

About one month later, Heaton and Henecke engaged in a jurisdictional argument at the Quaker Oats Job, and Henecke, for the first time ever, called Heaton a "spic." Then, Henecke, Heaton's project manager, took the extraordinary step of asking Novy to fire Heaton. That was the first time Henecke ever sought to fire a Weitz employee, and jurisdictional disputes were very common. It was extremely uncommon to have someone terminated over a jurisdictional dispute. Novy did not know that Henecke called Heaton a "spic." Novy attempted to fire Heaton, but he decided not to because Heaton expressed concern over the reason and the timing of the decision. Although Novy did not fire Heaton, he did require Heaton to apologize to Henecke over the jurisdictional argument before Heaton was allowed to work under Henecke again.

Next, in August of 2003, Heaton's specially trained foreman and journeyman were suddenly terminated and pulled off of the Quaker Oats Stair Job which caused Heaton and his crew to fall behind schedule. Prior to the completion of the Quaker Oats Stair Job, Heaton was assigned to work on a project with project manager Hackbarth. When the Quaker Oats Stair Job was completed, Novy assigned ironworker superintendent Bovero to the job, and he told Heaton that "things were catching up with [him]." Novy offered Heaton work as a journeyman at the ADM Job. Neither Novy nor several other Weitz employees can recall a time when any Weitz superintendent was demoted down to an entry-level position. Typically, Weitz tries to keep its superintendents employed, even when work was slow, because superintendents are valuable and highly trained employees that Weitz does not want to lose to another construction company.

In December of 2003, after Novy told Heaton that there would not be any work for ironworkers until November of 2004, Heaton learned that Weitz ironworkers were working at the Longview Fibre Job, a mining job for which Heaton had special training. On January 15, 2004, Heaton saw other ironworkers working at the Weitz warehouse. Novy admits that Weitz's business has been booming and that it has had work for Heaton since December of 2003.

In January of 2004, Weitz managers claimed to have called Heaton because they had work available for him, but they did not follow the common practice of offering Heaton the job by contacting Zahorik, Weitz's Union business agent. Instead, they claimed to have called Heaton directly. Then, when ironworker superintendent Bovero was fired in January of 2005, Weitz did not contact Heaton, either directly or through Zahorik, for the job.

Given those facts, the court finds that Heaton has raised a material issue of fact as to the third element of his prima facie case; he has shown a causal nexus between his protected activity and the adverse employment action. The causal connection is made especially clear by the fact that, on October 29, 2003, when Novy met with Heaton after the superintendents meeting and offered him the journeyman position at the ADM Job, he told Heaton that "things were catching up with [him]." A jury could find that Novy's statement is in direct reference to the fact that Heaton complained about Huber's derogatory comments.

In sum, Heaton has met his burden of making a "minimal evidentiary showing" to "satisfy [his] burden of production" on the prima facie case. *Rodgers,* 417 F.3d at 850.

## C. The Legitimate, Nondiscriminatory Reason

Since Heaton established a prima facie showing of retaliation, a presumption of retaliation arises and the burden shifts to Weitz to show a legitimate, nondiscriminatory reason for the adverse employment action. *Wallace*, 442 F.3d at 1119-20. Here, Weitz's proffered reason for giving Heaton the choice between a layoff or demotion to journeyman

is that there was a work slowdown and they did not have work for ironworker foremen or superintendents. This is a legitimate, nondiscriminatory reason. Therefore, Weitz rebutted the presumption of retaliation and the burden shifts back to Heaton to show that the reason is pretext for retaliation. *Id.* at 1120.

### D. Pretext

Once Weitz has shown a legitimate, nondiscriminatory reason for its actions, the burden then shifts back to Heaton to show that Weitz's reason was "pretextual." *Turner*, 421 F.3d at 696. "In making a showing at this final stage, evidence used to support the prima facie case is considered along with other evidence before the court to determine whether there exists a triable fact on the ultimate issue of retaliation." *Wallace*, 442 F.3d at 1120 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The Eighth Circuit Court of Appeals has explained:

> There are at least two routes by which a plaintiff may demonstrate a material question of fact at this final stage of the analysis. First, a plaintiff may succeed "indirectly by showing that the employer's proffered explanation is unworthy of credence," *Burdine,* 450 U.S. at 256, because it has "no basis in fact." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 834 (8th Cir. 2002). Second, a plaintiff may succeed "directly by persuading the court that a [prohibited] reason more likely motivated the employer." *Burdine,* 450 U.S. at 256. Both of these routes, in effect, amount to a showing that the prohibited reason, rather than the proffered reason, actually motivated the employer's action.
>
> The first route, directly rebutting the proffered reason as false, usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motivations. It typically involves a broader rebuttal of the employer's underlying factual claims. *See, e.g., Reeves,* 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). . . .

The second route, in contrast, does not necessarily involve disproving the underlying factual claims of the employer. It focuses instead on rebuttal of the employer's ultimate factual claim regarding the absence of retaliatory intent. *See Strate v. Midwest Bankcentre, Inc.,* 398 F.3d 1011, 1017-18 (8th Cir. 2005) ("[W]e have long recognized that a genuine issue of fact regarding unlawful employment [retaliation] may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action."). Success under this route is dependant on showing that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motiving explanation. *See Buettner,* 216 F.3d at 717 (stating that a plaintiff "must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions"); *Strate,* 398 F.3d at 1017 ("'pretext' [is] shorthand for indicating that a defendant's proffered . . . explanation . . . is a pretext for unlawful discrimination, not that it is merely false in some way"); *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 946 n.8 (8th Cir. 1994) (same). In effect, a plaintiff may concede that the proffered reason, if truly the motivating cause for the termination, *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action. *See, e.g., Hitt v. Harsco Corp.,* 356 F.3d 920, 924 (8th Cir. 2004) (stating that whether an age discrimination plaintiff could show pretext turned "on whether age was . . . the true reason for, the decision to terminate").

*Wallace*, 442 F.3d at 1120-21 (footnote omitted) (emphasis in original).

The evidence Heaton presented sufficiently demonstrates retaliatory intent to establish Weitz's proffered reason for demoting and laying off Heaton was pretext. The court finds that "there exists a triable fact on the ultimate issue of retaliation." *Id.* at 1120. First, Heaton has shown that Weitz's "proffered explanation is unworthy of credence" because the reason has "no basis in fact." *Id.* (citations omitted). Weitz claims that there

was a work slowdown and, thus, it did not have work for ironworker foremen or superintendents. Heaton has presented evidence directly contradicting those facts. Heaton has shown that, in the fall of 2003, he was offered a journeyman position and ironworker Bovero replaced him as superintendent on the Hackbarth job. Heaton has shown that, in December of 2003, there were ironworkers working at the Longview Fibre Job in Mason City. In January of 2004, there were other ironworkers working at the Weitz warehouse. Therefore, Heaton has "directly rebutt[ed] the proffered reason as false." *Id.*

Even if Heaton had not "directly rebutted the proffered reason as false" under the first route articulated by the Eighth Circuit Court of Appeals, *id.*, he has certainly shown "that sufficient evidence of intentional retaliation exists for a jury to believe [Heaton's] allegations and find that the proffered explanation was not the true motiving explanation," *id.* at 1121. There is no evidence in the record showing that Heaton refused to perform the essential functions of his job. *See Kasper*, 425 F.3d at 504 (affirming grant of summary judgment on plaintiff's retaliatory discharge claim, finding no pretext and refusing to "second guess an employer's decision to discharge an employee who refuses to perform the essential functions of the employee's job"). Indeed, Heaton has presented evidence that he was more skilled and better qualified to be a superintendent than other Weitz superintendents. At a minimum, Heaton has shown that he was laid off while other ironworkers remained employed. He has also shown that Weitz treated him differently than it had ever treated a superintendent during other work slowdown periods.

Heaton has established a material issue of fact regarding pretext. A jury could find that the true motivating explanation for Heaton's permanent layoff was retaliation for his complaint about Huber's derogatory comments.

## VII. CONCLUSION

Because Heaton established a prima facie case and established facts showing that Weitz's legitimate, nondiscriminatory reason is pretext for a retaliatory motive, summary judgment is inappropriate. Heaton is entitled to a jury trial on his retaliation claims.

For the foregoing reasons, it is hereby **ORDERED**:

(1)     The Weitz Company, Inc.'s Motion for Summary Judgment (docket no. 14) is **GRANTED** as to Counts I, II and V, and is **DENIED** as to Counts III and IV; and

(2)     The trial on the remaining counts (Counts III and IV) shall take place as set forth in the previously filed Trial Scheduling Order.

**IT IS SO ORDERED.**

**DATED** this 14th day of November, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA