**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| EDWARD D. HEATON,<br><br>   Plaintiff,<br><br>vs.<br><br>THE WEITZ COMPANY, INC.,<br><br>   Defendant. | No. 05-CV-102-LRR<br><br>**ORDER** |

_____

*TABLE OF CONTENTS*

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. STANDARD FOR RULE 50 MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . 3

IV. TRIAL EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   A. *Causal Connection* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   B. *Excessive Award for Lost Wages—Mitigation of Damages* . . . . . . . 13
   C. *Sufficiency of the Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . 16
     1. *Emotional Distress Damages* . . . . . . . . . . . . . . . . . . . . . 16
     2. *Punitive Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     3. *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI. DISPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I. INTRODUCTION

The matter before the court is Defendant The Weitz Company Inc.'s ("Weitz") Renewed Motion for Judgment as a Matter of Law, or Motion for a New Trial ("Motion") (docket no. 60).

## II. RELEVANT PROCEDURAL HISTORY

On June 21, 2005, Plaintiff Edward D. Heaton ("Heaton") filed a five-count Complaint. On November 14, 2006, the court granted summary judgment on three of the counts. The counts that remained for trial were Count III and IV. In Count III, Heaton alleged retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981a. In Count IV, Heaton alleged retaliation, in violation of Chapter 216 of the Iowa Civil Rights Act of 1965 ("ICRA").

On November 27, 2006, a jury trial commenced on Counts III and IV of the Complaint. On November 28, 2006, after the close of Heaton's case-in-chief, Weitz made an oral motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), on Counts III and IV, as well as on Heaton's claim for punitive damages. The court denied the motion on Counts III and IV, and reserved ruling on the punitive damages portion of the motion. On November 29, 2006, at the close of all of the evidence, Weitz renewed its motion on the punitive damages claim. The court denied the motion and submitted the case to the jury.

On November 29, 2006, the trial ended with a jury verdict in favor of Heaton. The jury awarded Heaton the following:

(1) $47,537.44 in lost wages for November 4, 2003, to July 7, 2006;
(2) $4,800.00 in lost health insurance benefits;
(3) $11,413.00 in lost pension benefits; and
(4) $73,320.00 in past emotional distress damages.

2

Therefore, the jury awarded Heaton a total of $137,070.44 in compensatory damages.[1]

The court allowed the parties to present additional evidence on the issue of punitive damages, and the jury returned a supplemental verdict for $25,000.00 in punitive damages.

On December 22, 2006, Weitz timely filed the Motion. On January 8, 2007, Heaton filed Plaintiff's Resistance to Defendant's Renewed Motion for Judgment as a Matter of Law or Motion for New Trial ("Resistance") (docket no. 61).[2] Neither party requested oral argument on the Motion, and the court finds the Motion to be fully submitted and ready for decision.

### III. STANDARD FOR RULE 50 MOTIONS

Weitz moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. "According to [Rule 50], judgment as a matter of law should not be granted unless 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)). Rule 50 provides, in part:

> **(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** . . . The movant may renew its request for judgment as a matter of law by filing a motion no later than 10

---

[1] Out of the seven categories of damages, the jury awarded no damages in three of the categories: (1) overtime or double time wages for November 4, 2003, to July 7, 2006; (2) lost bonuses for 2003, 2004 and 2005; and (3) loss of use of a superintendent's truck.

[2] On May 2, 2007, with the court's permission, Weitz filed Defendant's Supplemental Brief in Support of its Renewed Motion for Judgment as a Matter of Law, or Motion for New Trial (docket nos. 60-3, 65-3, and 67-1). The court shall hereinafter collectively refer to Weitz's filings as "Motion."

Also on May 2, 2007, Heaton filed Plaintiff's Supplemental Resistance to Defendant's Supplemental Brief (docket no. 68). The court shall hereinafter collectively refer to Heaton's filings as "Resistance."

3

> days after the entry of judgment . . . . The movant may alternatively request a new trial or join a motion for a new trial under Rule 59.
>
> In ruling on a renewed motion, the court may: **(1)** if a verdict was returned: **(A)** allow the judgment to stand, **(B)** order a new trial, or **(C)** direct entry of judgment as a matter of law . . . .

Fed. R. Civ. P. 50 (emphasis in original). The court should "draw 'all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence.'" *Benham*, 423 F.3d at 863 (quoting *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (same). "A reasonable inference is one which may be drawn from the evidence without resort to speculation." *Benham*, 423 F.3d at 863 (citations omitted). The Eighth Circuit Court of Appeals has stated that the court should

> consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence.

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Ass'n*, 928 F.2d 299, 301 (8th Cir. 1991) (discussing a motion for judgment notwithstanding the verdict, or "JNOV," and quoting *Atlas Pile Driving Co. v. Dicon Fin. Co.*, 886 F.2d 986, 989 (8th Cir. 1989)); *see also Meyers v. Starke*, 420 F.3d 738, 741 (8th Cir. 2005) (reviewing a Rule 50 motion and citing the standard articulated in *Lake Calhoun Association*).

> When Title VII claims of unlawful employment discrimination are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), "[w]hether judgment as a matter of law is appropriate in any

4

> particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves,* 530 U.S. at 148-49.

*Tatum v. City of Berkeley*, 408 F.3d 543, 549 (8th Cir. 2005) (modification in *Tatum*). Rule 50 motions should only be granted when "there is a complete absence of probative facts to support the verdict," *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 769-70 (8th Cir. 2004) (quotation omitted), and when the "record contains no proof beyond speculation to support the verdict," *id.* at 770 (quotations omitted). This court should not "lightly set aside a jury's verdict." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citing *EEOC v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)).

## IV. TRIAL EVIDENCE

When viewed in the light most favorable to Heaton, *see Lake Calhoun Ass'n*, 928 F.2d at 301, the facts are these:

Heaton, a person of Italian and Hispanic descent, became an journeyman ironworker after completing an apprenticeship program in 1992. In 2000, Heaton moved from California to Iowa and became a member of the Local 89 Ironworkers Union in Cedar Rapids. Charles Zahorik was Heaton's union business agent[3] during all of the relevant time periods.

On October 6, 2000, Zahorik sent Heaton to Weitz, where he began working as a journeyman ironworker. In April of 2001, Heaton was promoted to foreman. In December of 2002, he was promoted to general foreman. Weitz Vice President, Michael Novy, handpicked Heaton to be a superintendent, and on January 6, 2003, Heaton became

---

[3] One of a union business agents' main tasks is to find jobs for union members by sending them to contractors who are seeking to hire skilled workers.

5

a superintendent ironworker.[4]  As one of three ironworker superintendents, Heaton reported directly to Weitz's Vice President of Cedar Rapids Operations, Michael Novy. As a superintendent, Heaton was allowed to use a company truck, he had gas privileges and he was given a company cell phone.  Weitz provided funding for Heaton to purchase equipment for his crews.  At the height of his career he had between fifteen and twenty crew members reporting to him.

In 2003, Weitz's Cedar Rapids Operations division had revenues of $25,132,425.00.  In 2003, that division's profits were $909,579.00.  In 2004, the revenues were $26,426,656.00 and the profits were $186,740.00.  In 2005, the revenues were $18,582,936.00 and the profits were $140,700.00.

Prior to Heaton's promotion to superintendent in January of 2003, he had not had any disciplinary problems nor had he ever been told his work was deficient.

In March or April of 2003, a teamster superintendent, Noel Huber, directed teamsters to go to Heaton and tell him that he was a "fucking spic."  Additionally, Huber conveyed that the only thing worse than having his daughter marry a "fucking nigger" was if she were to marry a "fucking spic like Heaton."

On April 24, 2003, Heaton complained to Weitz's personnel benefits manager, Chantry DeVries, that Huber had made derogatory racial comments.  Heaton asked that Weitz stop the behavior, and Heaton asked that Novy not be informed about the complaint because he believed that Novy and Huber were friends outside of work.

DeVries knew that Weitz had written polices on antidiscrimination, antiharassment and antiretaliation.  DeVries is listed in such polices as Weitz's contact person for making complaints under the polices.  She is responsible for investigating all complaints.

---

[4] The positions for ironworkers at Weitz from most superior to least superior were superintendent, assistant superintendent, general foreman, foreman and journeyman. Journeymen had the least job security, because they were the first to be laid off in slow work periods.

6

Shortly after Heaton made the complaint, DeVries assigned the complaint to Novy for investigation. About a week after Heaton made the complaint, Novy informed Heaton that Huber was no longer with Weitz. Novy told Heaton that he hated to let Huber "go," because Huber was a long-time Weitz employee, and because Huber went to Novy's church and Novy knew Huber's children. At the time of his termination, Huber had been working at a popcorn plant job site with Weitz project manager Brian Henecke.

On May 27, 2003, Heaton and Henecke were at the Weitz offices, and they discussed unloading break down equipment off of trucks at the Quaker Oats job site. After some disagreement, they agreed that a composite crew, that is, a crew composed of ironworkers and millwrights, should unload the trucks the next day. Henecke instructed Heaton to go to the Quaker Oats job site the next day.

On May 28, 2003, at the Quaker Oats job site, Henecke called Heaton a "spic" and called Kameron Peterschmidt a "goon" in a verbal fight about who was to unload the trucks. Jurisdictional disputes are common in the industry and rarely result in disciplinary action. Henecke, for the first time in his career at Weitz, asked Novy to fire Heaton due to the jurisdictional dispute. Soon after the jurisdictional dispute, Novy called Heaton and told Heaton to come to his office immediately. Heaton went to Novy's office. Novy told Heaton that he was terminated because Henecke wanted him fired and because he was acting like a union steward. Novy handed Heaton his last two paychecks. When Heaton protested and asked whether he was being fired due to the April 24, 2003 complaint, Novy revoked the termination. Novy did, however, tell Heaton that Heaton would not be allowed to work on projects with Henecke until Heaton apologized to Henecke.

Heaton did not work on projects with Henecke until Heaton apologized in about August of 2003. After Heaton apologized, he was allowed to work on a job with Henecke.

In August of 2003, Heaton was working at the Quaker Oats plant on a stair job. Novy and Henecke drove out to the job site and, without advanced warning to Heaton,

7

removed two of Heaton's workers from his crew—Heaton's "two right hand men," Peterschmidt and journeyman Tom Waldrep. Novy and Henecke stated that they removed Peterschmidt and Waldrep from the job because they could not pass Quaker Oats's background check. However, after being terminated from the job, Peterschmidt successfully obtained security clearance at a nuclear power plant and began working there. Both Peterschmidt and Waldrep had worked at Quaker Oats on prior occasions without incident. The removal of these two crew members caused Heaton to fall behind schedule on the stair job and caused him much stress and anxiety. The only reason he did not quit his job was because Heaton's co-worker, Dennis Wolrab, convinced him to stay.

After Heaton completed the stair job, he was supposed to begin working on a project that Dan Hackbarth had assigned to him at General Mills. At the last minute, Novy reassigned the job to Chris Bovero, a superintendent who had been employed by Weitz since 1989.

On October 29, 2003, Novy met with Heaton and gave him an ultimatum. Novy told Heaton that he could choose between taking a demotion to journeyman or being laid off. During the conversation, Novy told Heaton that "things are catching up to you." Heaton elected to take a few weeks off, rather than be demoted down four levels to journeyman.

Several other Weitz employees had experienced demotions at one point in their careers at Weitz. The first Weitz employee who had experienced a demotion was Wolrab. Weitz's management had punished Wolrab by demoting him from general foreman directly down to journeyman as a result of his refusal to take another ironworker's project. Another employee who had been demoted was ironworker Mike Curtis. Curtis was an assistant superintendent between 1999 and 2001. Then, he was demoted from assistant superintendent to foreman and then demoted again down to journeyman. Between March 2001 and February 2004, Curtis was demoted and promoted between the ranks of general

8

foreman and journeyman eight different times, as the work loads changed. Curtis was not demoted directly from assistant superintendent (the highest rank he reached) down to journeyman. Another Weitz employee who was demoted was Floyd Sauter. Prior to the time Sauter reached the superintendent level, he had been moved to lower job grades during his employment at Weitz. Once Sauter reached the superintendent level, though, he was never demoted down from superintendent. Instead, Weitz found "busy work" for him to do or gave him vacation time during slow work periods. Additionally, Novy had punished Huber by giving him the choice between retirement or a demotion from superintendent to the lowest rank for teamsters—truck driver.

On November 4, 2003, Novy told Heaton that there would not be any work available for him until the fall of 2004, although other superintendents were still working. Heaton was earning $23.50 per hour at the time of the layoff.

During slow work periods, it is common for Weitz to assign superintendents to work on projects with other superintendents. In other words, a superintendent does not usually do labor, but when the work was slow, one superintendent would be doubled-up with another and the former would do labor rather than supervise, in order to avoid layoff. Weitz also keeps superintendents working by having them do "odd jobs" in its warehouses. If a superintendent is laid off, they would come back to work after the layoff as a superintendent. Additionally, Weitz has various divisions and sometimes sends its superintendents to other divisions to keep them working. However, the Cedar Rapids Operations division is the only Weitz division that employs ironworkers.

In October and November of 2003, there was a work slowdown period for ironworkers at Weitz. In October of 2003, Weitz did not hire any additional ironworkers. It hired a total of two ironworkers in November and December of 2003. However, other irornworkers, including Wolrab, Steve Faye and Joe Johnson, all remained working during

9

this period. Moreover, Weitz kept some of its superintendents busy during this period by allowing them to do "odd jobs" in its warehouse, like building shelves.

Heaton and Weitz superintendent Matt Kula had a telephone conversation after the November 4, 2003 layoff. During the conversation, Kula expressed his regret that Heaton had been laid off. Kula never offered Heaton a job at Weitz.

On December 15, 2003, Heaton sent Novy a certified letter explaining to Novy that he was available for work and had been since the November 4, 2003 layoff. Novy did not respond to the letter.

On January 16, 2004, Heaton emailed DeVries, asked to return to work and complained that Weitz was retaliating against him. On January 21, 2004, Heaton filed a complaint with the Cedar Rapids Civil Rights Commission. On January 22, 2004, DeVries sent an email back to Heaton, in which she responded to the January 16, 2004 email, but she never conducted an investigation into Heaton's complaints of retaliation.

On March 8, 2004, Weitz contacted Heaton and offered him a journeyman's position. Heaton turned down the job offer because journeymen are the first to be laid off and nothing would prevent Weitz from laying him off after working for only a couple of hours.

In January of 2005, Bovero left Weitz, leaving two ironworker positions open—one superintendent position and one general foreman position. Weitz did not offer Heaton either of those positions, so he filed a second complaint of retaliation with the Cedar Rapids Civil Rights Commission.

After the November 4, 2003 layoff, Heaton went to the union hall and placed his name on the "out of work" list. Additionally, he conducted an online job search and applied for work at fourteen different companies.

10

On May 2, 2004, Heaton began working as a skilled machine mechanic at PMX Industries for $16.50 per hour. Later, he was promoted and began receiving pay of $20.20 per hour.

At trial, Heaton testified that, following the termination, he felt "inadequate" and had no sense of identity. Heaton went to a psychologist and family counselor for help, and he began taking antidepressant medication, which he continued to take at the time of trial. The medication had undesireable side effects, including sweating, nausea and insomnia. Heaton testified that, neither the antidepressant medication nor the "talk therapy" helped him.

## *V. ANALYSIS*

Weitz makes three arguments in its Motion.[5] Weitz first argues that it is entitled to judgment as a matter of law or a new trial because Heaton did not prove a causal connection between the protected activity and the adverse employment action. Next, Weitz argues that, because Heaton refused to work as a journeyman in November of 2003, he failed to mitigate his damages. Finally, Weitz argues that Heaton did not present sufficient evidence to support the jury's emotional distress or punitive damages awards.

### *A. Causal Connection*

Weitz argues that Heaton did not prove element three of the prima facie case of retaliation, that is, that he did not prove a causal connection between the adverse employment action and the protected activity. *See Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007) (setting forth the three elements of a prima facie case). In a post-trial motion for judgment as a matter of law or new trial, however, the court should not examine the prima facie case. *See Kohler Co.*, 335 F.3d at 773 n.7 (determining that the district court acted improperly in ruling on a post-trial motion, because it considered the

---

[5] Weitz has four numbered arguments, but the court combines its sufficiency of the evidence arguments.

plaintiff's failure to meet the third element of the prima facie case of retaliation and stating that "[r]eturning to this inquiry . . . was improper because the case had been tried on the merits"). "[O]nce a trial on the merits has occurred, the issue of whether the plaintiff established a prima facie case is moot, and the question then becomes whether the plaintiff produced sufficient evidence to allow the jury reasonably to find that the defendant intentionally retaliated against the plaintiff because of statutorily-protected conduct." *Id.* at 773 (citations omitted); *see also Cardenas v. AT&T Corp.*, 245 F.3d 994, 998 (8th Cir. 2001) ("[W]here a court has fully tried a case on the merits, it is inappropriate to return to the question of whether the plaintiff established a prima facie case."). In other words, "the *McDonnell Douglas*[6] presumptions fade away," and "the principle issue" becomes whether the plaintiff "produced sufficient evidence to allow a reasonable jury to find [the defendant] retaliated against [the plaintiff]." *Kohler Co.*, 335 F.3d at 773 (citations omitted); *see also Cardenas*, 245 F.3d at 998 (reviewing a district court's denial of a motion for judgment as a matter of law and explaining that it need not "review the adequacy of the evidence at each stage of the *McDonnell Douglas* analysis," but instead must "concentrate[] on whether the record supports the ultimate finding of discrimination").

Viewing the evidence as a whole and in the light most favorable to Heaton, the court finds that a reasonable jury could find that Weitz retaliated against Heaton. *See Kohler Co.*, 335 F.3d at 774. That is, Heaton provided evidence from which a jury could conclude that there was a pattern of adverse actions against him beginning shortly after the time he complained to DeVries on April 24, 2003, and lasting until the time he was laid off on November 4, 2003. *See Hite*, 446 F.3d at 866 (explaining that "[a]n employee can establish a causal link . . . through the timing of the two events" and stating that "[a] pattern of adverse actions that occur just after protected activity can supply the extra

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

12

quantum of evidence to satisfy the causation requirement" (quotations omitted)). There are several pieces of evidence that could add up to a conclusion of retaliation: Novy's statement that "things are catching up to you"; the pattern of adverse conduct after April 24, 2003, including the racially-charged comment by Henecke, the reneged termination and forced apology, the removal of the crew members, and the re-assignment of the project to another superintendent; the lack of disciplinary problems before April 24, 2003; and the six-month period between the complaint and layoff. *Cf. Bassett v. City of Minneapolis*, 211 F.3d 1097, 1104 (8th Cir. 2000) (finding sufficient evidence of a causal connection where the plaintiff had received a favorable evaluation prior to her complaint of discrimination, where less than two months lapsed between the complaint and the termination and where, immediately after making the complaint, the defendant "imposed an increasing level of discipline for infractions similar to those of [the plaintiff]'s peers who were not similarly disciplined, administered negative performance evaluations, denied [the plaintiff] training opportunities and privileges afforded to her peers, and 'papered' a file to support its ultimate recommendation of termination"); *Kohler Co.*, 335 F.3d at 774 (finding that a one month lapse was insufficient, by itself, to support a jury's verdict in favor of the plaintiff on the plaintiff's retaliation claim).

The court shall deny this part of the Motion.

### B. Excessive Award for Lost Wages—Mitigation of Damages

Next, Weitz argues that the jury's award for lost wages[7] was excessive because Heaton failed to mitigate his damages when he declined to work as a Weitz journeyman in November of 2003.[8] Heaton responds that the award was not excessive, because (1)

---

[7] The jury awarded Heaton $47,537.44 in lost wages for the period between November 4, 2003, and July 7, 2006.

[8] Weitz argues that the jury's lost wages award was excessive, but it does not state
(continued…)

13

the jury awarded less than the $55,959.04 he requested, (2) Weitz never objected to the mitigation instruction that was read to the jury, (3) the trial evidence showed that journeymen are the first to be laid off in slow work periods and, had he accepted the journeyman position, the collective bargaining agreement permitted Weitz to lay him off again after working as little as four hours, and (4) Heaton looked for work through the union hall.

"When an employer makes a discriminatory employment decision against an individual, that individual has a duty to look for another position to mitigate his damages." *Chalfant v. Titan Distr'n, Inc.*, 475 F.3d 982, 992 (8th Cir. 2007) (citing *Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 904-05 (8th Cir. 2006)); *see also Canny*, 439 F.3d at 904-05 (explaining that the plaintiff's duty to mitigate requires him to attempt to find "substantially equivalent employment").

The duty to mitigate damages does not mean that Heaton was required to "'go into another line of work, accept a demotion, or take a demeaning position.'" *Chalfant*, 475 F.3d at 992 (quoting *Canny*, 439 F.3d at 905). Heaton's efforts to mitigate "need not be successful but must represent an honest effort to find substantially equivalent work." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002). Weitz had the burden to prove that Heaton did not mitigate his damages. *Chalfant*, 475 F.3d at 992.

At trial, the jury was instructed, in part, as follows:

> A plaintiff has a duty under the law to "mitigate" his damages, that is, to exercise reasonable diligence under the circumstances to minimize his damages. Therefore, if you find that [Weitz] has proved by the greater weight of the evidence that [Heaton] failed to seek out or take advantage of

---

[8](…continued)
what the damage amount should be or use the "remittitur" language. *Cf. Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 904-05 (8th Cir. 2006) (discussing the defendant's motion for remittitur of the jury's damages award for lost earnings).

14

> an opportunity to reduce his damages that was reasonably available to him, then you must reduce his damages by the amount that he reasonably could have avoided if he had sought out or taken advantage of such an opportunity.

Jury Instruction No. 12 (docket no. 44). Juries are presumed to follow the court's instructions. *See United States v. Levine*, 477 F.3d 596, 605 (8th Cir. 2007) (stating that the Eighth Circuit Court of Appeals must presume "that the jury followed the court's instructions taken as a whole"); *see also United States v. Harper*, 466 F.3d 634, 647 (8th Cir. 2006) ("[W]e presume juries to be composed of prudent, intelligent individuals, and we will not speculate whether jurors disregard the court's instructions of law or their oaths."). Therefore, the court presumes that the jury followed the mitigation portion of the jury instructions.

The jury reasonably could have concluded that Heaton mitigated his damages, despite his declination of the journeyman position at Weitz. The evidence showed that Weitz's November 4, 2003 offer and March 8, 2004 offer to allow Heaton to work as a journeyman were not offers for comparable employment, because the position of journeyman was four ranks below the position of superintendent. The jury could have concluded that, after Heaton had worked his way up from his position as journeyman when he was hired by Weitz in October of 2000 to superintendent in 2003, his refusal to take the journeyman position in November of 2003 was not a failure to mitigate damages. *See Hartley*, 310 F.3d at 1062 (awarding back pay to a plaintiff because he was close to retirement age and had a difficult time finding a comparable job). Moreover, journeymen were the first to be laid off during slow work periods and such positions were not secure. The jury could have also concluded that, after the November 4, 2003, offer for employment as a journeyman, Heaton continued to seek superintendent-level employment.

15

*See, e.g.*, Trial Ex. 6 (Letter dated December 12, 2003, from Heaton to Novy in which Heaton reminds Novy that he is available to work).

Accordingly, Weitz's Motion shall be denied on this ground.

### C. *Sufficiency of the Evidence*

Weitz's final argument is that Heaton did not present sufficient evidence to support the jury's emotional distress damages award or its punitive damages award. Weitz seeks judgment as a matter of law denying the damages awards.

#### 1. *Emotional Distress Damages*

Weitz argues that Heaton's own testimony was not enough to warrant an emotional distress damages award. It argues that he needed to have other witnesses corroborate his testimony in order to have the jury consider such damages. Heaton responds that his own testimony about his depression, anxiety and counseling was sufficient for the court to submit the issue of emotional distress damages to the jury.

In a case involving the Americans with Disabilities Act ("ADA"), the Eighth Circuit Court of Appeals recently described what type of testimony is needed to support a court's submission of the issue of emotional distress damages to a jury:

> A plaintiff is entitled to damages for emotional distress when there is evidence of actual emotional distress caused by an employer's discriminatory acts in violation of the ADA. Emotional distress damages must be supported by competent evidence of genuine injury. A plaintiff's own testimony can be sufficient for a finding of emotional distress, and medical evidence is not necessary. The plaintiff's testimony must offer specific facts as to the nature of his claimed emotional distress and the causal connection to the employer's alleged violations. Furthermore, awards for pain and suffering are highly subjective and the assessment of damages is within the sound discretion of the jury, especially when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms.

*Christensen v. Titan Distr'n, Inc.*, 481 F.3d 1085, 1096-97 (8th Cir. 2007) (citations,

16

modifications and quotations omitted). Moreover, the amount of compensatory damages awarded for emotional distress is reviewed by the Eighth Circuit Court of Appeals "'with a keen sense of respect for the latitude given to juries,'" and it "order[s] remittitur only if the verdict is so grossly excessive as to shock the conscience." *Rowe v. Hussmann Corp.*, 381 F.3d 775, 783 (8th Cir. 2004) (quoting *Kucia v. SE Ark. Cmty. Action Corp.*, 284 F.3d 944, 947 (8th Cir. 2002)).

The court concludes that Heaton's own testimony that he sought counseling from both a family counselor and a psychologist and began taking antidepressant medications following his termination from Weitz is adequate to sustain the jury's emotional distress damages award. After working as an ironworker for over a decade, Heaton testified that he identified himself as an ironworker and took pride in his work. The jury could have concluded that Heaton's pride was taken from him when Novy offered him the choice between journeyman or layoff. It was reasonable for the jury, "equipped as it was with the collective wisdom that life's experiences confer, to determine the amount that would adequately compensate [Heaton] for that injury." *Rowe*, 381 F.3d at 783. The jury's emotional distress damages award shall be upheld.

### 2. *Punitive Damages*

Weitz argues that there is insufficient evidence to uphold the jury's punitive damages award because Weitz did not act with malice or reckless indifference to Heaton's right to be free from retaliation. Heaton counters that the series of retaliatory actions by Novy and Henecke show the level of recklessness needed to support the punitive damages award.

A plaintiff in a retaliation case is entitled to punitive damages where the employer has retaliated "'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Christensen*, 481 F.3d at 1096 (quoting *Canny*, 439 F.3d at 903). "An employer acts with malice or with reckless indifference if it has knowledge

17

that it may be acting in violation of federal law. If the employer is unaware federal law prohibits the relevant conduct, then it is not liable for punitive damages." *Id.* (quotations and citations omitted); *see also Chalfant*, 475 F.3d at 991 ("To be liable for punitive damages, it is not sufficient that the employer simply knows that it is discriminating against an employee. The employer must also know that it 'may be acting in violation of federal law.'" (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)). "'The requisite level of recklessness or outrageousness can be inferred from management's participation in the discriminatory conduct.'" *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 503 (8th Cir. 1998) (quoting *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 575 (8th Cir. 1997)). The Eighth Circuit Court of Appeals has also explained that

> [t]he twin policy objectives of punitive damages are punishment and deterrence. The amount of punitive damages awarded under [Title VII and the ICRA] should reflect this purpose of punishment and deterrence, taking into account additional factors such as the severity of the defendant's misconduct, the presence of aggravating or mitigating factors, and the financial situation of the defendant.

*Denesha*, 161 F.3d at 503 (citations omitted); *see also Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1062-63 (2007) (discussing the Constitutional limits to punitive damages awards).

Viewing the evidence in the light most favorable to the verdict, the court finds that there was sufficient evidence to support the punitive damages award. Novy and DeVries both testified they were aware of Weitz's anti-discrimination and anti-retaliation policies, as well as the fact that both federal and state law prohibited retaliation against an employee who engaged in protected activities, such as complaining about a co-worker's racially charged comments. *Chalfant*, 475 F.3d at 991-92 (finding sufficient evidence to support the district court's submission of the punitive damages claim to the jury where the evidence showed, in part, that the employer knew that disability discrimination was illegal under

18

federal and state laws). The evidence showed that, from the time Heaton complained to DeVries on April 24, 2003, she did not investigate the complaint personally but immediately turned it over to Novy. DeVries kept no records of her conversations with Novy regarding his investigation of the complaint, nor did she follow-up with Heaton. Instead, Novy conducted the investigation, terminated Huber and met with Heaton to explain that Huber was "let go." Members of Weitz's management team, namely Novy and Henecke, then participated in the retaliation against Heaton. *See Denesha*, 161 F.3d at 503 (inferring recklessness due to management's participation in the discrimination). In May of 2003, Henecke engaged in the jurisdictional dispute with Heaton, calling him a "spic." Novy then forced Heaton to apologize to Henecke, took two of his crew members away from him and re-assigned Heaton's project to another superintendent. Weitz's management failed to keep Heaton busy during the work slowdown, although other ironworkers and superintendents remained working. The jury reasonably could have found that Novy, a high-level manager, participated in the retaliation against Heaton. Therefore, the jury's award of punitive damages is sound.

To the extent Weitz challenges the amount of punitive damages awarded, the court finds the $25,000 award is not excessive in light of all of the evidence and the total award of compensatory damages. *See Denesha*, 161 F.3d at 503 (listing factors to consider in assessing amount of punitive damages awarded); *see also Salitros v. Chrysler Corp.*, 306 F.3d 562, 576 (8th Cir. 2002) (affirming a $100,000 punitive damages award in a disability discrimination case and stating that "[t]here is no tenable argument that punitives of less than one-fourth of the front pay are excessive in relation to [the plaintiff]'s economic losses").

19

### *3.     Conclusion*

The evidence presented at trial was sufficient to support the jury's awards of emotional distress damages and punitive damages.  Accordingly, the court shall deny Weitz's Motion in relevant part.

### *VI.  DISPOSITION*

For the foregoing reasons, Weitz's Motion (docket no. 60) is **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 13th day of July, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA